**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NETWORK MANAGING SOLUTIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 16-295-RGA |
| | ) |
| AT&T MOBILITY LLC, | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |
| NETWORK MANAGING SOLUTIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 16-296-RGA |
| | ) |
| SPRINT CORPORATION and SPRINT SPECTRUM L.P., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendants. | ) |
| | ) |
| NETWORK MANAGING SOLUTIONS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 16-297-RGA |
| | ) |
| T-MOBILE USA, INC., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |

|  |  |  |
|---|---|---|
| NETWORK MANAGING SOLUTIONS, LLC, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | C.A. No. 16-298-RGA |
| UNITED STATES CELLULAR CORPORATION, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) |  |
| NETWORK MANAGING SOLUTIONS, LLC, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | C.A. No. 16-299-RGA |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) |  |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS</u>

POLSINELLI PC
Shanti M. Katona (No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, DE  19801
302-252-0924
skatona@polsinelli.com


*Of Counsel:*

David E. Finkelson
Justin R. Lowery
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA  23219-4030
(804) 775-1000
dfinkelson@mcguirewoods.com
jlowery@mcguirewoods.com

Jason W. Cook
MCGUIREWOODS LLP
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
(214) 932-6418
jcook@mcguirewoods.com

*Attorneys for Defendant*
*Sprint Corporation and*
*Sprint Spectrum L.P.*

SHAW KELLER LLP
John W. Shaw (No. 3362)
Jeffrey T. Castellano (No. 4837)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com

*Of counsel:*

L. Norwood Jameson
Matthew S. Yungwirth
S. Neil Anderson
DUANE MORRIS LLP
1075 Peachtree St. NE, Suite 2000
Atlanta, GA 30309
(404) 253-6900
wjameson@duanemorris.com
msyungwirth@duanemorris.com
snanderson@duanemorris.com

Joseph A. Powers
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103
(215) 979-1842
japowers@duanemorris.com

Christopher J. Tyson
Justus L. Getty
DUANE MORRIS LLP
505 9th Street NW, Suite 1000
Washington, DC  20004
(202) 776-7804
cjtyson@duanemorris.com
jlgetty@duanemorris.com

*Attorneys for Defendant*
*AT&T Mobility LLC*

GREENBERG TRAURIG, LLP
Benjamin J. Schladweiler (No. 4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE  19801
(302) 661-7394
schladweilerb@gtlaw.com

*Of Counsel*:

Joshua C. Krumholz
Jacob K. Baron
Mark T. Goracke
Jacob W. S. Schneider
HOLLAND & KNIGHT LLP
10 St. James Avenue, 11th Floor
Boston, MA  02116
(617) 523-2700
joshua.krumholz@hklaw.com
jacob.baron@hklaw.com
mark.goracke@hklaw.com
jacob.schneider@hklaw.com

*Attorneys for Defendants*
*T-Mobile USA, Inc. and*
*Cellco Partnership d/b/a Verizon Wireless*

April 6, 2018

RICHARDS, LAYTON & FINGER, P.A.
Steven J. Fineman (No. 4025)
Katharine L. Mowery (No. 5629)
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700
fineman@rlf.com
mowery@rlf.com

*Of Counsel:*

Douglas I. Lewis
Paul E. Veith
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
dilewis@sidley.com

John P. Wisse
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX  75201
(214) 981-3300
jwisse@sidley.com

*Attorneys for Defendant United States Cellular*
*Corporation*

# Table of Contents

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    LEGAL STANDARD ...........................................................................................2

III.   THE '099 PATENT ...............................................................................................3

    A.    BACKGROUND ..........................................................................................3

    B.    ARGUMENT ................................................................................................5

        1.    The '099 Patent Claims Are Directed to the Abstract Idea of
            Selectively Intercepting and Forwarding Messages ...................................5

            a.    The '099 Patent Claims Are Not Directed to a Technical
                Improvement ..........................................................................................5

            b.    Comparable Cases Confirm That the '099 Patent Is Directed to
                an Abstract Idea .....................................................................................7

        2.    The '099 Patent Claims Do Not Include an Inventive Concept ..................7

IV.    THE '968 PATENT ...............................................................................................9

    A.    BACKGROUND ..........................................................................................9

    B.    ARGUMENT ..............................................................................................11

        1.    The '968 Patent Claims Are Directed to the Abstract Idea of
            Exchanging Information Between Managers During and Between
            Work Shifts ...............................................................................................11

            a.    The '968 Patent Claims Are Not Directed to a Technical
                Improvement ........................................................................................11

            b.    Comparable Cases Confirm That the '968 Patent Is Directed to
                 an Abstract Idea ...................................................................................13

        2.    The '968 Patent Claims Do Not Include an Inventive Concept ................13

V.     THE '213 AND '688 PATENTS .........................................................................15

    A.    BACKGROUND ........................................................................................15

    B.    ARGUMENT ..............................................................................................17

        1.    The '213 and '688 Patent Claims Are Directed to the Abstract Idea of
            Managers Requesting Updates from Subordinates ...................................17

            a.    The '213 and '688 Patent Claims Are Not Directed to a
                Technical Improvement .........................................................................18

            b.    Comparable Cases Confirm That the '213 and '688 Patents
                Are Directed to an Abstract Idea .........................................................19

        2.    The '213 and '688 Patent Claims Do Not Include an Inventive
            Concept .....................................................................................................20

VI.    CONCLUSION ...................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   No. 2017-1452 (Fed. Cir. Feb. 14, 2018) ...............................................................2

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
   838 F.3d 1266 (Fed. Cir. 2016) ..............................................................2, 7, 13

*Alice Corp. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) ..................................................................................*passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................................2

*Ass'n of Molecular Pathology v. Myriad Genetics, Inc.*,
   133 S. Ct. 2107 (2013) ...........................................................................................2

*Automated Tracking Solutions, LLC v. Coca-Cola Co.*,
   No. 2017-1494 (Fed. Cir. Feb. 16, 2018) ..............................................................2

*Callwave Commc'ns, LLC v. AT&T Mobility*,
   207 F. Supp. 3d 405 (D. Del. 2016) .......................................................................2

*Commonwealth v. Goodwin*,
   186 Pa. 218 (1898) .................................................................................................3

*D&M Holdings Inc. v. Sonos, Inc.*,
   Case No. 16-cv-141-RGA, 2017 WL 1395603 (D. Del. Apr. 18, 2017)............4, 19

*Dealertrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012) .............................................................................7

*Elec. Power Grp. v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) .........................................................................6, 19

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ..........................................................................3, 7

*Intellectual Ventures I LLC v. Capital One Bank*,
   792 F.3d 1363 (Fed. Cir. 2017) ........................................................................6, 20

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) .............................................................................9

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
   850 F.3d 1315 (Fed. Cir. 2017) ....................................................................3, 8, 14

*Intellectual Ventures I LLC v. Symantec Corp.*
    838 F.3d at 1316 (Fed. Cir. 2016) ................................................................................. 7

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) .................................................................................... 2

*IpLearn, LLC v. K12 Inc.*,
    76 F. Supp.3d 525 (D. Del. 2014) ......................................................................... 11, 12

*Kinglite Holdings Inc. v. Micro-Star Int'l Co*,
    Case No. 14-cv-03009, 2016 WL 4205356 (C.D. Cal. May 26, 2016) ......................... 18, 19

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ..................................................................................................... 12

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) .................................................................................... 8

*Novo Transforma Technologies, LLC v. Sprint Spectrum L.P.*,
    Case No. 14-cv-612-RGA, 2015 WL 5156526 (D. Del. 2015) ...................................... 14

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ............................................................................ 12, 14

*Olmstead v. U.S.*,
    277 U.S. 438 (1928) .................................................................................................... 4

*People v. Ryan*,
    82 N.Y.2d 497 (N.Y. 1993) .......................................................................................... 3

*Personalized Media Communications, LLC v. Amazon.com, Inc.*,
    161 F. Supp.3d 325 (D. Del. 2015) ............................................................................. 13

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
    855 F.3d 1322 (Fed. Cir. 2017) .................................................................................. 3, 6

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ...................................................................................... 6

*Tranxition, Inc. v. Lenovo (United States) Inc.*,
    664 F. App'x 968 (Fed. Cir. 2016) .............................................................................. 13

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) .................................................................................. 12

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ..................................................................................... 3, 8

*West View Research, LLC v. Audi AG*,
    685 F. App'x 923 (Fed. Cir. 2017) .............................................................................. 19

**Statutes**

35 U.S.C. § 101 ................................................................................................................*passim*

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(c)..............................................................................2

## I.      INTRODUCTION

Defendants T-Mobile USA, Inc., Sprint Corporation and Sprint Spectrum L.P., Cellco

Partnership d/b/a Verizon Wireless, AT&T Mobility LLC, and United States Cellular

Corporation ("Defendants") respectfully bring this Motion for Judgment on the Pleadings against

Network Managing Solutions, LLC's ("NMS") Complaint[1] for infringement of U.S. Patent Nos.

6,553,099 (the "'099 Patent"), 6,420,968 (the "'968 Patent"), 6,351,213 (the "'213 Patent") and

6,728,688 (the "'688 Patent") (collectively, the "Patents-in-Suit").

Each of the Patents-in-Suit is patent-ineligible under 35 U.S.C. § 101 and *Alice Corp. v.

CLS Bank Int'l*, 134 S. Ct. 2347 (2014), for claiming abstract ideas related to exchanging and/or

forwarding communicated information.  First, the '099 Patent claims a system for selectively

intercepting and forwarding messages, a centuries-old practice in the United States and around

the world.  Second, the '968 Patent claims exchanging information between managers during and

between work shifts, which reflects the age-old concept of managers working collaboratively.

Finally, the '213 and '688 Patents both claim managers requesting updates from subordinates,

which humans have done for ages when requesting information from one another.

Applying these longstanding practices to telecommunications networks using

conventional, generic components does not convert these abstract ideas into patent-eligible

subject matter.  *See Alice*, 134 S. Ct. at 2358.  Indeed, the Patents-in-Suit readily admit, as they

must, that much of their claimed subject matter was known in the telecommunications field.

After stripping away the already known telecommunications technology, all that remains are the

abstract ideas themselves.  Moreover, particularly where, as here, the patents expressly admit

---

[1] Because NMS's complaints against the Defendants do not differ in substantial ways,
Defendants cite to Case No. 16-cv-297, D.I. 17 ("Complaint") for purposes of this Motion.

that the claimed subject matter was largely known, routine, or even standardized, there are no

underlying factual questions to resolve prior to determining that the Patents-in-Suit claim

ineligible subject matter.[2]   Thus, all four Patents-in-Suit are ineligible and Defendants are

entitled to judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.[3]

*See Callwave Commc'ns, LLC v. AT&T Mobility*, 207 F. Supp. 3d 405, 409-10 (D. Del. 2016)

(Andrews, J.) (outlining legal standard for a motion for judgment on the pleadings under § 101).

## II.   LEGAL STANDARD

Abstract ideas "are not patentable" under 35 U.S.C. § 101.  *Alice*, 134 S. Ct. at 2354

(quoting *Ass'n of Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)).

*Alice* mandates a two-step framework to determine whether patents claim unpatentable abstract

ideas.  *See id.* at 2355.  In *Alice* step one, a court must determine whether, in light of the patent's

specification, the claims' "character as a whole is directed to excluded subject matter."  *Internet*

*Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  As part of that

analysis, courts assess "whether the claims are directed to a specific means or method for

improving technology or whether they are simply directed to an abstract end-result."

---

[2] Judgment on the pleadings cannot be defeated by conclusory averments of an inventive concept.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 681 (2009); *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1259-60 (Fed. Cir. 2016); *Automated Tracking Solutions, LLC v. Coca-Cola Co.*, No. 2017-1494, at *11 (Fed. Cir. Feb. 16, 2018); *cf. Aatrix Software, Inc. v. Green Shades Software, Inc.*, No. 2017-1452, at *8-11 (Fed. Cir. Feb. 14, 2018).   Neither the specifications nor NMS's Complaint even contend that the Patents-in-Suit claim uncommon components or unconventional arrangements of those components.  *See Automated Tracking*, No. 2017-1494 at *11 (affirming judgment of ineligibility on the pleadings where "[t]he complaint at issue has no allegations, which when accepted as true, would even create a factual issue, and [the patent's] specification indicates that the components of the claimed invention are conventional").

[3] The parties have submitted proposed claim constructions.  (*See, e.g.,* Case No. 16-cv-297, D.I. 65-1 ("Proposed Constructions") .)  Defendants contend that the claims of the Patents-in-Suit are invalid under § 101 and *Alice* regardless of which constructions are adopted by the Court.

*RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (internal quotes omitted). Comparing the "claims at issue to those claims already found to be directed to an abstract idea in previous cases" also informs this inquiry. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

If the claims are directed to an abstract idea, then a court must proceed to *Alice* step two, where the analysis shifts to determine whether the claims include an "inventive concept" "sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. To avoid invalidation under this second step, the claims "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (citations and internal quotation marks omitted); *see also Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1331 (Fed. Cir. 2017) (requiring claims do more than "simply recite[] that the abstract idea will be implemented using the conventional components and functions generic to" a given technological environment).

## III.    THE '099 PATENT

### A.    Background

Selectively intercepting and forwarding messages is a longstanding practice as old as police work and post offices.[4] The '099 Patent acknowledges that forwarding intercepted information was well-known and conventional at the time of its filing, including in the law

---

[4] For example, postal officials in the French *cabinet noir* (or "black chamber") spied on the King's subjects' letters between the 17th and 19th centuries, a practice followed contemporaneously by many other countries in Europe and later in the United States. *See Commonwealth v. Goodwin*, 186 Pa. 218 (1898) (jailhouse guard promised to deliver prisoner's letter, but instead read it) (citing English common law for similar facts). The U.S. police practice of intercepting messages continues in the modern era. *See People v. Ryan*, 82 N.Y.2d 497 (N.Y. 1993) (police intercepted Federal Express package in-transit and searched pursuant to a warrant).

enforcement context.  The '099 Patent describes a traditional wiretap, where a phone company

waits for a user to make a call, then forwards the audio of the call to police.  ('099 Patent, 1:24-

28 ("[i]n classic telephone services, [lawful intercept] can be done relatively easily in the local

switching office of the subscriber to be monitored by marking the appropriate subscriber data

record and setting up a type of conferencing circuit for [law enforcement].").)  Such traditional

wiretaps have been known in the telecommunications field and recognized by courts for nearly a

century.  *See Olmstead v. U.S.*, 277 U.S. 438 (1928) (addressing the constitutionality of

intercepting telephone calls)*.*  The '099 Patent seeks to apply this longstanding idea of

intercepting and forwarding messages to "store-and-forward" systems ('099 Patent, 2:57-60,

4:19-24) that include a digital mailbox in a communications network (*e.g.,* "a voice mailbox, a

data mailbox or any other device for indirectly transmitting messages").  (*Id.* at 2:58-60, 4:21-

26.)  According to the patent, these mailboxes were "known in principle to those of skill in the

pertinent art in a large number of widely varying types and designs" at the time of filing.  (*Id.* at

2:51-53.)

     Asserted claim 6 of the '099 Patent is representative and reads:[5]

> A communications device for indirectly forwarding messages in data and/or
> communications networks, comprising:
>    a communications processor;
>    a memory device connected to said communications processor for storing messages
>      and receiver identification;
>    said communications processor being programmed to:
>      check an identification of a subscriber accessing the device;
>      store information indicating whether a subscriber is to be monitored and, if
>        appropriate, by what monitoring user the subscriber is to be monitored; and

---

[5] "[T]he district court is not required to individually address claims not asserted or identified by
the non-moving party, so long as the court identifies a representative claim and all the claims are
substantially similar and linked to the same abstract idea."  *D&M Holdings Inc. v. Sonos, Inc.*,
Case No. 16-cv-141-RGA, 2017 WL 1395603, at *2 (D. Del. Apr. 18, 2017) (Andrews, J.)
(quotation omitted).

permit a message addressed to a given subscriber marked as a subscriber to be monitored to be transmitted to a monitoring user stored for the given subscriber.[6]

**B.     Argument**

**1.     The '099 Patent Claims Are Directed to the Abstract Idea of Selectively Intercepting and Forwarding Messages**

As NMS describes it, "[t]he '099 Patent relates to lawful intercept technologies that indirectly forward messages in data and/or communications networks." (Complaint, ¶ 15.)  The patent claims a mailbox that (i) stores information regarding whether a user is being monitored (a "target"), (ii) checks whether a user accessing the device is a target and (iii) if the mail is addressed to a target, then transmits that user's message to the monitoring party.  (*See* '099 Patent, cls. 1, 6.)  This claimed concept is akin to the centuries-old practice of a post office storing mail addressed to persons prior to delivery, and an official at the post office (i) maintaining a list of target senders and recipients, (ii) inspecting mail dropped off at the post office by a sender to see if sent by or addressed to a target and (iii) if the mail is addressed to a target, then forwarding a copy of the mail to law enforcement.  The '099 Patent claims do not include any technical improvement to intercepting messages, and comparable cases confirm that its claims are directed to the longstanding practice of selectively intercepting and forwarding an individual's messages.  As such, the '099 Patent claims are not eligible for patent protection.

**a.     The '099 Patent Claims Are Not Directed to a Technical Improvement**

Far from offering any technical improvement, the claims simply apply the centuries-old practice of selectively intercepting and forwarding a user's messages to a digital mailbox (the

---

[6] Asserted dependent claim 9 requires the transmission of metadata to a monitoring user. Asserted claim 1 mirrors claim 6, but is written in means-plus-function format.

5

claimed "device").[7]  *See RecogniCorp*, 855 F.3d at 1326.  Although the mailbox happens to be digital, the '099 Patent's specification makes no attempt to identify a problem unique to digital mailboxes, much less propose a solution that addresses such a problem and advances the technology.  *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("the claims are not directed to a solution to a 'technological problem'").  The specification instead: (i) acknowledges that the lawful intercept of a user's information was well-known (and indeed required by law) at the time of filing ('099 Patent, 1:19-41); (ii) acknowledges that digital mailboxes were well-known at the time of filing (*id.* at 2:51-53, 4:19-24); and (iii) applies to those admittedly conventional digital mailboxes the abstract idea of selectively intercepting and forwarding messages.  Claims cannot, however, sidestep *Alice* step one simply by restricting an abstract idea to a particular technological environment, here lawful intercept for digital mailboxes.  *Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1366 (Fed. Cir. 2017) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment[.]").

Functional language is a "frequent feature of claims held ineligible under § 101" because it indicates that claims may not be directed to a technical improvement, but instead to abstract end results.  *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016).  Here, claim 6 claims "check[ing] an identification of a subscriber," "stor[ing] information indicating whether a subscriber is to be monitored," and "permit[ting] a message . . . to be transmitted . . .[,]" but does not include any limitations explaining **how** to achieve the stated functions.  By claiming

---

[7] NMS asserts that the construction of "device" and "communication device" in the claims of the '099 Patent is "one or more components in one or more locations," while Defendants assert that the proper construction is "mailbox."  (D.I. 78-1, at 14.)  Under either construction, the § 101 analysis remains the same.

**what** a device does rather than **how** a device does it (via some specific means or method for improving technology), the claim language further demonstrates that the claims of the '099 Patent are not directed to any technical improvement, but rather the abstract idea of selectively intercepting and forwarding messages.

### b. Comparable Cases Confirm That the '099 Patent Is Directed to an Abstract Idea

The '099 Patent bears striking similarity to another patent that the Federal Circuit affirmed as patent-ineligible under § 101.  *See Enfish*, 822 F.3d at 1334.  In *Intellectual Ventures I LLC v. Symantec Corp.*, the patent claimed "systems and methods for receiving, screening, and distributing email."  838 F.3d at 1316 (Fed. Cir. 2016).  Like the '099 Patent, the patent disclosed "actions includ[ing] **gating the message for further review**, as in claim 1, and also releasing, deleting, returning, or **forwarding the message** . . . ."  *Id.* at 1317 (emphasis added).  The Federal Circuit analogized the patent's disclosure to a "corporate mailroom" that used "business rules defining actions to be taken regarding correspondence."  *Id.*  Here, the '099 Patent uses a business rule that triggers an action: if a person is being monitored, then forward his message to the police.  (*See* '099 Patent, cls. 1, 6.)  Such an action represents, as it did in *Symantec*, nothing more than the abstract idea of selectively intercepting and forwarding messages.  *See also Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1331, 1333 (Fed. Cir. 2012) (finding that claims for managing and forwarding credit applications covered "the basic concept of processing information through a clearinghouse").

### 2. The '099 Patent Claims Do Not Include an Inventive Concept

The claims of the '099 Patent also do not contain any "additional features" that embody an "inventive concept."  *Alice*, 134 S. Ct. at 2357.  The claims instead recite the use of conventional telecommunication components to implement the abstract idea, which is

insufficient to constitute an "inventive concept." *Erie Indemnity Co.*, 850 F.3d at 1331.  The

'099 Patent claims a generic "communications device" (*e.g.,* a digital mailbox) composed of two

common components ("a processor" and "a memory device"), but "generic computer

components do not satisfy the inventive concept requirement." *See Mortg. Grader, Inc. v. First*

*Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) (citations omitted).  The '099

Patent's specification discloses that, as with the digital mailbox, the other claimed components of

the digital mailbox were also common: (i) the "means for storing" were "known to the person

skilled in the art in a large number of widely varying types and designs" ('099 Patent, 2:63-66);

(ii) the "means for checking an identification of a subscriber" were "known to the person skilled

in the art in a large number of widely varying types and designs" (*id.* at 3:18-21); and (iii) the

"means for permitting a message addressed to a given subscriber" were performed by simple

functions that did not necessitate further elaboration ("implemented by appropriate software" and

"simply . . . by means of an appropriate search in a subscriber table" (*id.* at 3:44-54, 6:52)).

Moreover, there is nothing unconventional about the arrangement or function of these

common components that would constitute an inventive concept.  *See Erie*, 850 F.3d at 1331;

*Ultramercial*, 772 F.3d at 715.  First, the claims say nothing about whether the components are

arranged in any unconventional way.  (*See* '099 Patent, cls. 1, 6.)  Second, the claims' common

components perform their conventional functions: the memory device stores information and the

processor executes instructions.  (*See id.* cls. 1, 6.)  Third, the claims "merely describe the

functions of the abstract idea itself" – the device checks the user who is accessing the device,

determines whether the user is being monitored, and if so permits the message to be forwarded to

law enforcement, but "our law demands more." *Intellectual Ventures I LLC v. Capital One Fin.*

*Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017).  Because its claims are directed to an abstract idea and fail to provide any inventive concept, the '099 Patent is ineligible under § 101.

## IV.     THE '968 PATENT

### A.     Background

The concept of managers exchanging information with one another between and during work shifts is a practice that has existed as long as people have worked collaboratively together. When managers at different levels are tasked with fixing a problem, the solution has long been to record and exchange information during and between these managers' periods of responsibility. For example, doctors and nurses record patient treatment information in charts (*e.g.*, responsible physician, history of patient vital signs and drugs administered) during their shifts.  As shifts change, the on-coming and off-going doctors and nurses share patient charts with one another to ensure that they have as much information as possible to provide the best care possible.

The '968 Patent attempts to apply the same solution of sharing information between managers to the field of telecommunications networks.  ('968 Patent, 1:33-45, 2:40-45.)  Instead of doctors and nurses at a hospital, the '968 Patent claims human operators at "management devices" in a telecommunications network.  (*Id.*, 1:27-45, 1:66-2:11, 5:12-19.)  The management devices receive alarms indicating that other network equipment have experienced an error, and the operators interface with the management devices to troubleshoot the underlying issue and attempt to resolve the alarm, for example by running diagnostics on or rebooting parts of the equipment.  (*Id.*; *see also id.* at 1:32-35, 2:12-15, 2:40-45, 6:11-42.)  Like doctors and nurses treating a patient over different shifts, human operators at different management levels and over different periods of responsibility will troubleshoot and repair the underlying error.  (*Id.* at 1:33-45, 2:40-45, 6:7-10, 6:14-22, 6:43-47.)

9

Because the task of troubleshooting and repairing equipment is a collaborative and "time-dependent" one, the '968 Patent proposes a solution akin to sharing information via patient charts: the operators document their work during their period of responsibility with "checking attributes," and the associated management devices exchange these records with each other using a "checking function."  (*Id*. at 2:36-47 ("The checking function according to the invention results in automatic coordination between the management devices."), 7:11-21.)  Examples of these exchanged "checking attributes" include the alarm status (*e.g.,* open, closed, being repaired, etc.) (*id*. at 7:31-48), the person responsible for troubleshooting and repairs (*id*. at 3: 30-31, 7:54-58), and relevant times for troubleshooting (*e.g.*, when repairs were initiated or completed) (*id.* at 7:49-54).

Claim 1, which NMS has asserted, is representative and reads:

A method for handling alarms, which comprises:
  providing a management network having at least two management devices on
      different management levels;
  receiving active alarms by the management devices;
  storing active alarms by one management device as agent or by the other
      management device as superior manager;
  handling active alarms for a specific period of time by operators that are coupled to
      the management devices; and
  introducing between the management devices a checking function having at least
      one checking attribute for reciprocal information about alarm handling.[8]

_____

[8] Asserted system claim 20 mirrors claim 1 and adds that the "checking function" is introduced over a "communications interface."  (*See* '968 Patent, cl. 20.)  The asserted dependent claims cover different types of information or "checking attributes" exchanged (*see id.* at cls. 6, 7, 10) and agent-manager relationships between management devices (*see id.* at cl. 19).

B.      **Argument**

1.      **The '968 Patent Claims Are Directed to the Abstract Idea of Exchanging Information Between Managers During and Between Work Shifts**

The claims of the '968 Patent are directed to the abstract idea of exchanging information between managers during and between work shifts.  (*Id.* at 2:45-53.)  As described above, the claimed steps are akin to doctors and nurses as managers at different levels ("providing" step), during their given shifts: (i) receiving reports regarding patient treatment, including critical events ("receiving" step), (ii) recording associated information in patient charts ("storing" step), (iii) monitoring or treating the patients ("handling" step), and (iv) sharing information with one another via the patients' charts ("introducing" step).  *See IpLearn, LLC v. K12 Inc.*, 76 F. Supp.3d 525, 533 (D. Del. 2014) (Andrews, J.) (finding claims abstract in part because the limitations could be performed by humans).  Because exchanging information between managers during and between shifts is an age-old solution to work collaboratively across multiple shifts, it is not patent-eligible subject matter.

a.      **The '968 Patent Claims Are Not Directed to a Technical Improvement**

The claims do not offer any technical improvement, but rather apply the fundamental collaborative work practice of managers exchanging information between and during work shifts to conventional equipment in a telecommunications network.  Indeed, the '968 Patent discloses that nearly all of the claimed subject matter was known in the telecommunications field at the time of filing.  As a result, none of the following could constitute a technical improvement: telecommunications networks, including the then-popular GSM standard ('968 Patent, 4:43-51); management devices within those networks (*id.* at 1:12-21); operators interfacing with management devices (*id.* at 1:36-38, 5:66-6:10); management-level hierarchies (*id.* at 1:12-21;

11

*id.* at 1:22-35, 4:52-57, 5:38-41, Fig. 1); network equipment sending alarms (*id.* at 1:22-26; 1:54-55, 5:66-6:10); management devices receiving alarms (*id.* at 1:22-29; 1:54-55, 5:66-6:10, Figs. 2, 3); management devices storing alarms (*id.* at 1:26-35; 5:66-6:10); and the management device operators handling alarms for a specific period of time (*id.* at 1:26-46; 6:11-47).

What the '968 Patent purports to add is the "introducing . . . a checking function" step, which simply automates the abstract idea of exchanging information between managers during and between shifts for management devices in a telecommunications network.  But simply automating a manual process on conventional computer elements to make the process faster, or occur more frequently, quickly, or accurately, is not patentable. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015).  Nor does applying the abstract idea to a certain field-of-use suffice for patentability.  *See Alice*, 134 S. Ct. at 2358 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012)).

As with the '099 Patent, the '968 Patent claims merely describe functional results or effects (**what** happens), rather than how the functions are performed in an inventive manner (**how** it happens).  *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("We look to whether the claims in the patent focus on a specific means or method, or are instead directed to a **result or effect** that itself is the abstract idea and merely invokes generic processes and machinery.") (emphasis added).  For example, the patent does not claim **how** the checking function exchanges checking attributes between management devices – only that it occurs.  (*See* '968 Patent, cl. 1.)  Such results-oriented claiming further confirms that the claims are not directed to a particular technical improvement, but rather to the abstract idea of exchanging information between managers during and between work shifts using conventional computer elements.

### b. Comparable Cases Confirm That the '968 Patent Is Directed to an Abstract Idea

The claims of the '968 Patent are similar to those held ineligible in *Personalized Media Communications, LLC v. Amazon.com, Inc.*, 161 F. Supp.3d 325, 331-32 (D. Del. 2015) (Andrews, J.). There, the claims related to a method of "updating operating instructions" on a computer, a process analogous to "checking to see if a copy of the Federal Rules is up to date, and, if it is not, replacing it with a new one." *Id.* Here, because the '968 Patent claims are likewise directed to updating information (exchanging information between managers during and between work shifts), the '968 Patent claims are similarly ineligible under § 101.

The '968 Patent claims also are akin to those held ineligible in *Tranxition, Inc. v. Lenovo (United States) Inc.*, 664 F. App'x 968, 971-72 (Fed. Cir. 2016). The claims in *Tranxition* were "directed to the abstract idea of migration, or transitioning, of [user] settings," or moving data from one computer to another. *Id.* at 972; *see id.* at 969-70 (additional background on the claims). The Federal Circuit held that "automat[ing] the migration of data between two computers" was "not sufficient under step one of *Alice*." *Id.* at 971. Because there is no substantial difference between the '968 Patent claims (automatic exchanging of data from one computer to another) and those in *Tranxition* (automatic data migration from one computer to another), the claims of the '968 Patent are likewise ineligible.

### 2. The '968 Patent Claims Do Not Include an Inventive Concept

The '968 Patent claims do not include any "additional features" that embody an "inventive concept." *Alice*, 134 S. Ct. at 2357. As discussed above, the specification states that all of the claimed components (management devices in a network) were known in the telecommunications field at the time of filing. *Symantec*, 838 F.3d at 1317 (a patent's specification is "particularly useful in determining what is well-known or conventional"). As

13

discussed above, the claims instead focus on **functions** performed by the management devices, *i.e.*, generic computer servers (*see* '968 Patent, 5:3-37, 5:47-65).  But the patent acknowledges that all of these functions other than the checking function were well-known, and the checking function does nothing more than simply automate the abstract method of exchanging information between managers during and between shifts.  *OIP Techs.*, 788 F.3d at 1363.

Nor are the claimed common components arranged in any unconventional way.  *See Erie*, 850 F.3d at 1331.  The claims of the '968 Patent recite two connected management devices with operators interfacing with those management devices.  The specification, however, discloses that this arrangement was known and conventional.  ('968 Patent, 1:13-55, 5:3-6:24.)

In addition, exchanging information between managers during and between work shifts does not solve a problem unique to telecommunications networks.  ('968 Patent, 2:40-45); *see Novo Transforma Technologies, LLC v. Sprint Spectrum L.P.*, Case No. 14-cv-612-RGA, 2015 WL 5156526, at *3 (D. Del. 2015) (Andrews, J.) (finding no inventive concept where claims did "not solve a problem rooted in computer technology[,]" but rather one "common to all types of communications.").  The exchange of information is the same solution employed by doctors and nurses, or anyone involved in collaborative work.  Because the '968 Patent claims are directed to an abstract idea and fail to include any inventive concept, they are ineligible under § 101.

## V.      THE '213 AND '688 PATENTS[9]

### A.      Background

Managers in any organization regularly request status updates from subordinates.  For example, partners in law firms email associates to ask for case updates, and associates reply to the partner's emails with updated information.  The '213 and '688 Patents apply this concept of managers requesting updates from subordinates to telecommunications networks.

The '213 and '688 Patents relate to subordinate agents sending alarms to higher level managers in a telecommunications network.  If network equipment experiences an error (*e.g.*, running out of memory), then the agent will receive an alarm and forward the alarm to its manager.  ('213 Patent, 1:22-48; '688 Patent, 1:21-47.)  If the communications link between the agent and manager is down, however, the agent will be unable to send alarms to the manager. (*Id.*)  In that scenario, the agent will queue its alarms and wait for the connection to be restored. (*Id.*)

When the connection is restored, the '213 and '688 Patents disclose and claim a "realignment" process between agent and manager.  ('213 Patent, Abstract, 1:29-43; '688 Patent, Abstract, 1:25-42.)  The claimed process is straightforward.  Just as a partner would email an associate for a case update after being offline for a period of time, the manager sends the agent a request for alarms that queued while the connection was down.  The agent then responds with the requested alarms, just as the associate would respond with the case update.  The '213 and '688 Patents also disclose the use of "correlation information," which, like an email subject line, links

---

[9] Although the '213 and '688 Patents do not share a common specification, their disclosures are very similar and the '213 Patent's specification references the German Patent Application P19752614.4, to which the '688 Patent claims priority.  ('213 Patent, 1:49-67.)  Accordingly, this Motion discusses them together.

specific communications between the manager and the agent together. ('213 Patent, 2:14-18, 1:62-67, 6:24-30, 6:47-58, 7:46-59, 8:37-65; '688 Patent, 2:47-53, 3:8-31, 8:33-61, Fig. 4.)

All claims of the '213 Patent and certain dependent claims of the '688 Patent further require that instead of requesting all of the agent's alarms at once, the manager may specify certain parameters to filter or sort what the agent sends. For example, the manager may request that the agent send only alarms received in the last two hours or sort the alarms by urgency. ('213 Patent, 2:19-21, 2:57-3:23, 6:30-42, Figs. 4-8; '688 Patent, 7:43-57, Figs. 3-4.) Likewise, a partner may request an associate only send urgent case updates or updates only to the discovery portion of the case. Finally, the '688 Patent adds that these realignments may occur in parallel between one agent and multiple managers, a process similar to one multitasking associate replying to separate emails from two partners. ('688 Patent, 1:66-2:3, 2:6-21, Figs. 2-4.)

Asserted method claim 1 of the '213 Patent is representative and reads:

A method for handling alarms in a telecommunication system using a management
network which has a plurality of management levels, wherein alarm data for active
alarms is transmitted for alarm realignment between an agent on one management level
and at least one manager on a next highest management level, the method comprising
the steps of:
    sending, from the at least one manager to the agent, at least one request notification
        for transmission of the alarm data;
    sending, from the agent to the at least one manager, correlation information for
        assigning a respective request to the at least one request notification with the
        alarm data;[10] and
    controlling, via the at least one manager, the alarm realignment on the basis of at
        least one parameter sent to the agent by the at least one manager.[11]

---

[10] Defendants argue that this claim limitation is indefinite. (*See, e.g.,* Proposed Constructions.)
For the purposes of this Motion, whether the correlation information is linking the "respective
request" to what follows or "a respective request to the at least one request notification" to what
follows is immaterial. Under both interpretations, the patent is claiming an abstract idea.

[11] Asserted system claim 12 mirrors method claim 1 and specifies generic components in the "at
least one manager" that perform the first "sending" step ("transmission element") and the
"controlling" step ("control element") of claim 1, and that receive the information sent in the
second "sending" step of claim 1 ("receiving element"). (*Id.* at cl. 12.) The asserted dependent

Asserted method claim 1 of the '688 Patent is representative and reads:

A method for handling alarms in a communication system using a management network having a number of management levels, wherein alarm data for active alarms is transmitted for parallel alarm realignments between an agent on a first management level and managers on a next highest management level, said method comprising the steps of:
> transmitting from each of the managers to the agent at least one request having a request notification for transmission of alarm data; and
> transmitting from the agent to a respective manager a number of notifications having the requested alarm data along with at least one item of correlation information for assigning a respective request to the notifications.[12]

**B.    Argument**

**1.    The '213 and '688 Patent Claims Are Directed to the Abstract Idea of Managers Requesting Updates from Subordinates**

The '213 and '688 Patents' claims are directed to the abstract idea of managers requesting updates from subordinates.  ('213 Patent, 2:35-43; '688 Patent, 3:22-51.)  As described above, the claimed "transmitting" and "sending" steps are akin to (i) a partner requesting a case update from an associate in an email and (ii) the associate responding with the requested updates in an email reply whose subject line links these communications together with a "RE: []."  Likewise, the claimed requirement that the manager send a parameter to the subordinate agent specifying that the agent should only send certain alarms is akin to a partner requesting in her email that the associate only send updates on certain case matters.  *Alice* dictates that such basic, abstract ideas are not patentable.

---

claims cover different types of parameters (*id.* at cls. 4, 18) and specify that the parameter is sent by the manager in a standardized field (*id*. at cl. 13; *see also id. at* 8:15-18, 7:30-33, 2:28-21.).
[12] Asserted system claim 13 mirrors method claim 1 and specifies generic components in the managers and agents that respectively (i) perform the two "transmitting" steps of claim 1 ("first" and "second" "transmitters") and (ii) receive the information sent in the two "transmitting" steps of claim 1 ("first" and "second" "receivers").  (*See* '688 patent, cl. 13.)  Asserted dependent claim 2 adds that both managers and agent send each other correlation information.  (*Id.* at cl. 2.)  Asserted dependent claim 5 adds that the managers send "filter criteria" for the alarm data sent by the agent.  (*Id.* at cl. 5.)  The other asserted dependent claims vary the type of manager, request and correlation information.  (*Id.* at cls. 6, 16-21.)

        **a.**       **The '213 and '688 Patent Claims Are Not Directed to a Technical Improvement**

The claims do not offer any technical improvement, but rather apply the abstract idea of managers requesting updates from subordinates to conventional computer elements in a telecommunications network. Indeed, the '213 and '688 Patents acknowledge that all of the following was known in the telecommunications field, and thus could not serve as a technical improvement at the time of filing: telecommunications networks, including GSM ('213 Patent, 3:54-4:38; '688 Patent, 4:54-5:38); fault-management hierarchy between agents and managers ('213 Patent, 1:13-29; '688 Patent, 1:12-38); transferring alarms both during alarm realignment and normal connectivity ('213 Patent, 1:22-48; '688 Patent, 1:21-47); and the types of messages used to communicate alarms, including during alarm realignment ('213 Patent, 1:49-67, 7:27-56, 8:15-18, 8:66-9:2, 9:61-64, 10:24-64, Figs. 4-8; '688 Patent, 1:48-65, 7:65-8: 24, 8:43-65). What the patents purport to add to the telecommunications field is: (i) using identifiers ("correlation information") to link specific communications between a manager and agent together ('213 Patent, 2:35-43; '688 Patent, 3:22-51); and (ii) the manager sending a parameter to the agent to limit the information sent in response ('213 Patent, 2:22-35; '688 Patent, 3:52-64.) Neither of these additions constitutes a technical improvement that is distinguishable from a subordinate's email response to a manager's email request. For example, a partner's email with the subject "Plaintiff's trial witness list" that requests an alphabetical list of a plaintiff's trial witnesses would elicit a responding email with the subject "Re: Plaintiff's trial witness list" containing a sorted list of the Plaintiff's trial witnesses. Applying these well-established methods of communicating to the field of telecommunication networks is not enough to receive patent protection. *Alice*, 134 S. Ct. at 2358.

Although the '688 Patent claims are, like those of the '213 Patent, directed to managers

requesting updates from subordinates, the '688 Patent envisions multiple requests and updates

occurring at once.  ('688 Patent, 3:3-16.)  But multitasking is no special, inventive trick, and it is

well-known in the computer and networks arts.  *See, e.g.*, *Kinglite Holdings Inc. v. Micro-Star*

*Int'l Co*, Case No. 14-cv-03009, 2016 WL 4205356, at *4-5 (C.D. Cal. May 26, 2016) (finding a

patent directed to the abstract idea of "multitasking" ineligible).  The '688 Patent does not

describe any new technology to improve multitasking, but instead discloses that the claimed

multitasking embodiments are made more efficient by using the time-worn solution of linking

together each manager's respective communications with the same agent.  ('688 Patent, 2:53-56,

3:8-13; *see id.* at cl. 1.)  As such, the patents are directed to an abstract idea.

### b.      Comparable Cases Confirm That the '213 and '688 Patents Are Directed to an Abstract Idea

Several similar cases also demonstrate that the '213 and '688 Patents are directed to an

abstract idea.  The Federal Circuit has repeatedly affirmed the ineligibility of patents that collect

and act upon information, as the agents do in the '213 and '688 Patents.  *See Elec. Power Grp.*,

830 F.3d at 1353 ("we have treated collecting information, including when limited to particular

content . . ., as within the realm of abstract ideas.") (collecting cases).  *See also D&M Holdings*,

2017 WL 1395603, at *4 ("data transfers and communications between devices are well-known

and conventional").  Likewise, the Federal Circuit has held that retrieving results via a query, just

as the managers query agents in the '213 and '688 Patents, constitutes an abstract idea.  *See West*

*View Research, LLC v. Audi AG*, 685 F. App'x 923, 926 (Fed. Cir. 2017).  Moreover, claims

directed to "multitasking" or "doing two things nearly simultaneously" in a computer are

ineligible under § 101.  *See Kinglite Holdings*, 2016 WL 4205356, at *4-5.  The '688 Patent

similarly claims two or more realignment processes occurring in parallel.

### 2.     The '213 and '688 Patent Claims Do Not Include an Inventive Concept

The claims of the '213 and '688 Patents do not contain any "additional features" that embody an "inventive concept." *Alice*, 134 S. Ct. at 2357.  As discussed above, the patents acknowledge that nearly all of the claim limitations were well-known and the claimed components are generic agents and managers.  The '213 and '688 Patents do not purport to arrange these components in any unconventional manner.

Finally, the '213 and '688 Patents contend that the use of correlation information and parameters results in greater efficiency and enables parallel alarm realignments.  Even if true, however, any such benefits would not constitute an inventive concept because they would merely be the result of applying the abstract idea itself.  *See Capital One Bank*, 792 F.3d at 1367 ("Nor, in addressing the second step of *Alice*, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept.") (citation omitted).  Because the claims of the '213 and '688 Patents are directed to an abstract idea and lack any inventive concept, they are ineligible for patent protection.

## VI.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court hold that the Patents-in-Suit claim ineligible subject matter under 35 U.S.C. § 101 and grant their Motion for Judgment on the Pleadings.

Respectfully submitted,

POLSINELLI PC

SHAW KELLER LLP

*/s/ Shanti M. Katona*
Shanti M. Katona (No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, DE  19801
302-252-0924
skatona@polsinelli.com

*Of Counsel:*

David E. Finkelson
Justin R. Lowery
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA  23219-4030
(804) 775-1000
dfinkelson@mcguirewoods.com
jlowery@mcguirewoods.com

Jason W. Cook
MCGUIREWOODS LLP
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
(214) 932-6418
jcook@mcguirewoods.com

*Attorneys for Defendant*
*Sprint Corporation and*
*Sprint Spectrum L.P.*

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Jeffrey T. Castellano (No. 4837)
Andrew E. Russell (No. 5382)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com

*Of counsel:*

L. Norwood Jameson
Matthew S. Yungwirth
S. Neil Anderson
DUANE MORRIS LLP
1075 Peachtree St. NE, Suite 2000
Atlanta, GA 30309
(404) 253-6900
wjameson@duanemorris.com
msyungwirth@duanemorris.com
snanderson@duanemorris.com

Joseph A. Powers
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103
(215) 979-1842
japowers@duanemorris.com

Christopher J. Tyson
Justus L. Getty
DUANE MORRIS LLP
505 9th Street NW, Suite 1000
Washington, DC  20004
(202) 776-7804
cjtyson@duanemorris.com
jlgetty@duanemorris.com

*Attorneys for Defendant*
*AT&T Mobility LLC*

21

GREENBERG TRAURIG, LLP

/s/ Benjamin J. Schladweiler
Benjamin J. Schladweiler (No. 4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE  19801
(302) 661-7394
schladweilerb@gtlaw.com

*Of Counsel*:

Joshua C. Krumholz
Jacob K. Baron
Mark T. Goracke
Jacob W. S. Schneider
HOLLAND & KNIGHT LLP
10 St. James Avenue, 11th Floor
Boston, MA  02116
(617) 523-2700
joshua.krumholz@hklaw.com
jacob.baron@hklaw.com
mark.goracke@hklaw.com
jacob.schneider@hklaw.com

*Attorneys for Defendants
T-Mobile USA, Inc. and
Cellco Partnership d/b/a Verizon Wireless*


Dated:  April 6, 2018

RICHARDS, LAYTON & FINGER, P.A.

/s/ Katharine L. Mowery
Steven J. Fineman (No. 4025)
Katharine L. Mowery (No. 5629)
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700
fineman@rlf.com
mowery@rlf.com

*Of Counsel:*

Douglas I. Lewis
Paul E. Veith
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
(312) 853-7000
dilewis@sidley.com

John P. Wisse
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX  75201
(214) 981-3300
jwisse@sidley.com

*Attorneys for Defendant United States Cellular
Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin J. Schladweiler, hereby certify that on April 6, 2018, I caused the foregoing

***Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings*** to be

served via electronic mail upon the following counsel of record:

Brian E. Farnan
Michael J. Farnan
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff*
*Network Managing Solutions, LLC*

Ed Nelson, III
Brent Bumgardner
Barry Bumgardner
John Murphy
Eric M. Albritton
NELSON BUMGARDNER PC
3131 West 7th, Street Suite 300
Fort Worth, Texas 76107
ed@nelbum.com
brent@nelbum.com
barry@nelbum.com
murphy@nelbum.com
ema@nbafirm.com

*Counsel for Plaintiff*
*Network Managing Solutions, LLC*

 */s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)